GEORGE W. WATSON v. THE KEYSTONE IRON-WORKS
COMPANY.

No. 13,239.   (74 Pac. 269.)

SYLLABUS BY THE COURT.

1. JUDGMENTS — *Dormancy* — *Statute Construed.*   Section 445 of
the code (Gen. Stat. 1901, § 4895), which provides that if an exe-
cution be not sued out within five years from the date of the
judgment it shall become dormant, has reference to general
executions against the property of the debtor, and not to special
executions provided for by section 4994, General Statutes of 1901.

2. ——— *Statute Does Not Apply to a Decree for the Sale of Spe-
cific Real Property.*   Section 4895 of the General Statutes of
1901, providing that when a judgment becomes dormant it shall
cease to operate as a lien on the estate of a judgment debtor,
does not apply to a decree for the sale of specific real property.

3. ——— *Case Overruled.*   The case of *The State v. McArthur*,
5 Kan. 280, overruled.   [ See page 61, *post.*]

Error from Harper district court; PRESTON B. GIL-
LETT, judge.   First opinion filed November 7, 1903.
Reversed.   Rehearing granted February 16, 1904.
Second opinion filed October 8, 1904.   Original opin-
ion modified.

*F. Dumont Smith*, for plaintiff in error.

*T. A. Noftzger*, for defendant in error.

The opinion of the court was delivered by

SMITH, J. :   In January, 1890, the Attica State Bank
commenced a suit against the Attica Sugar Company
to recover on certain bonds and to foreclose a mort-
gage given to secure them.   The Keystone Iron-works
Company was made a party defendant, as well as
other parties having liens against the mortgaged
property.   On June 10, 1891, a final decree was en-
tered marshaling the liens.   It was adjudged that the
Attica Sugar Company was indebted to the Keystone

Iron-works Company in the sum of $13,032.60, and that the plaintiff in error, George W. Watson, and other persons, were sureties on the said debt to the amount of $11,774.90.  The judgment against the Attica Sugar Company, as principal, and the sureties mentioned, included a decree of foreclosure of a mechanic's lien filed by the Keystone Iron-works Company against the property of the sugar company, and the decree fixed this lien, in common with others, on one tract of real estate, and adjudged it a second lien, subject to that of plaintiff below, on another tract.

Six orders of sale were issued at the instance of the bank.  These orders of sale followed the language of the decree, setting forth the amount due each of the lien-holders, of whom there were more than twenty. Each of the several orders of sale concluded with the following direction to the sheriff:

"These are, therefore, to command you to cause the said above-described property to be appraised, advertised and sold according to law, separately, as described, and from the proceeds of such sale pay, first, the costs and expenses of suit and sale; second, the judgment and the interest; the residue, if any, to be paid into court to abide the order of said court."

Four orders to carry out the decree were issued and returned without sale, three in 1891 and one in 1893. On March 29, 1894, under a pluries order the real estate was sold; and under another, issued in January, 1895, certain pumps and fixtures were sold.

On June 20, 1896 (five years and ten days after the rendition of judgment), an execution was issued at the request of the Keystone Iron-works Company. This writ, after reciting that a part of the debt for which Watson and his sureties were liable had been paid, ordered that the sheriff, of the goods and chattels of the Attica Sugar Company and the Kansas

State Sugar Company, as principals, and George W. Watson and others, as sureties, cause to be made the amount of $11,774.90, and $2485.90 interest on the same, being the amount remaining due, and, for want of goods and chattels, that the amount be made out of the lands and tenements of the debtors. This execution was returned "No property found."

The above facts bring us to a consideration of the question whether the issuance of these orders of sale had the effect to keep the judgment alive, and to stay its dormancy for five years from the time the last one was issued. Section 4895 of the General Statutes of 1901 provides:

"If execution shall not be sued out within five years from the date of any judgment that now is or may hereafter be rendered in any court of record in this state, or if five years shall have intervened between the date of the last execution issued on such judgment and the time of suing out another writ of execution thereon, such judgment shall become dormant, and shall cease to operate as a lien on the estate of the judgment debtor."

Keeping a judgment in force by execution must find its authorization in the above section of the law. If the section quoted is construed to comprehend executions "against the property of the judgment debtor" only, commonly called "general executions," under which head it appears in the statute, then the suing out of special executions or orders of sale was ineffectual to prevent a dormancy of the money judgment rendered against Watson and his cosureties.

Section 4892 of the General Statutes of 1901 reads:

"Executions are of four kinds: *First*, against the property of the judgment debtor; *second*, against his person; *third*, for the delivery of the possession of real or personal property, with damages for withhold-

ing the same, and costs ; *fourth*, executions in special cases.''

This separation into classes we find in the General Statutes of 1868 (ch. 80, art. 20), which was adopted by the legislature with the headings to chapters and divisions as made by the commissioners. Under the head of ''Executions against the Property of the Judgment Debtor'' is found section 4895, General Statutes of 1901, *supra*. The section following this ( § 4896) gives the contents of such an execution, namely :

'' The writ of execution against the property of the judgment debtor, issuing from any court of record in this state, shall command the officer to whom it is directed that of the goods and chattels of the debtor he cause to be made the money specified in the writ ; and for want of goods and chattels, he cause the same to be made of the lands and tenements of the debtor ; and the amount of the debt, damages and costs for which the judgment is entered shall be indorsed on the execution.''

The next division is entitled ''Proceedings in Aid of Execution''; the next, ''Executions against the Person''; the third, ''Executions for the Delivery of Real or Personal Property''; and finally, ''Executions in Special Cases.'' Under the last head there is but one section of the statute, which reads :

''In special cases not hereinbefore provided for, the execution shall conform to the judgment or order of the court. When a judgment for any specified amount, and also for the sale of specific real or personal property, shall have been rendered, and an amount sufficient to satisfy the amount of the debt or damages and costs be not made from the sale of property specified, an execution may issue for the balance, as in other cases.'' (Gen. Stat. 1868, ch. 80, § 517; Gen. Stat. 1901, § 4994.)

In the General Statutes of 1901 (§§ 4927–4954) the compiler has arbitrarily inserted, under the heading

of "Executions against the Property of the Judgment Debtor," chapter 109 of the Laws of 1893, relating to the redemption of real estate sold on execution, special execution, or order of sale. This arrangement, made for convenience merely, is of no significance.

In the case of *Norton v. Reardon*, 67 Kan. 302, 72 Pac. 861, we recently held that the direction to the sheriff, found in section 4915, General Statutes of 1901, that he shall return a writ of execution within sixty days from its date, had no application to executions in special cases like those under consideration. The section fixing the time for a return is found with others under the head of "Executions against the Property of the Judgment Debtor."

It certainly would not be contended that section 4895, General Statutes of 1901, *supra*, which provides the only method of keeping a judgment alive, by the suing out of an execution, and which section, as we have seen, relates to executions against the property, can have any application to executions against the person, provided for in section 4982, General Statutes of 1901, which reads :

"An execution against the person of the judgment debtor shall require the officer to arrest such debtor and commit him to the jail of the county until he pay the judgment or is discharged according to law."

If the issuing of a special execution, which must conform to the order of the court, prevents dormancy, then an execution against the person must perform the same service. The claim that both of the last-mentioned executions are included within the meaning of section 4895 cannot be sustained. If said section includes executions in special cases, it certainly includes executions against the person. Again, it must be kept in mind that that section of the law which permits a judgment to receive a five-year lease

of life, after the suing out of an execution on it, uses the expression ''writ of execution.''   It is a misnomer to call a special execution, which is nothing more than an order of sale, a ''writ.''   In section 4994 the lawmakers were careful to omit the word ''writ,'' when referring to a special execution.

In *Norton v. Reardon, supra,* it was said :

''Those sections of the statute which provide for a levy of an execution on real estate of the judgment debtor before its sale by the officer can have no application to judicial sales ordered by the court, like that in the present case, where the property on which a lien was fixed was designated in the decree, and ordered sold to satisfy the amount of the charge against it.''

Under a special execution or order of sale the right to sell the property attaches in consequence of the decree of the court.

The question before us has received consideration in Ohio, under statutory provisions like ours.   In *Beaumont et al. v. Herrick,* 24 Ohio St. 445, 456, the court said :

''It is also claimed the decrees became dormant, under section 422 of the code, before the issuing of the last orders of sale, and that for this reason the sale is invalid.

''All judicial sales in this state require confirmation by the court before they can be completed.   Without conceding, therefore, that under our system, such sales can be impeached, on the ground of the dormancy of the judgment, otherwise than by a proceeding in error to reverse the order of confirmation, it is sufficient to say, in answer to the present objection, that we are satisfied the section of the code referred to has no application to decrees for the sale of specific real property.

''The section provides that if execution shall not be sued out within five years from the date of a judgment, or if five years shall intervene between the date of the last execution and the suing out of another writ

of execution, the judgment shall become dormant, and cease to operate as a lien on the estate of the judgment debtor.   This section has sole reference to judgments for money which are to be enforced by the writ of execution.   The succeeding section prescribes what a writ of execution shall contain, and shows that it is wholly inapplicable to the enforcement of decrees in equity for the sale of specific property.''

In *Moore v. Ogden*, 35 Ohio St. 430, it was held that a decree of foreclosure of a mortgage did not become dormant although no attempt was made to enforce it for more than twenty years.   The same opinion was given in Nebraska.   (*Herbage v. Ferree*, 65 Neb. 451, 91 N. W. 408.)

Counsel for defendant in error contends that if the issuance of a special execution does not keep the decree of foreclosure in force for five years from the date of such execution, then however diligently the plaintiff may have tried to sell the property, if he failed, the money judgment against the sureties would become dormant, and a judgment creditor without fault might suffer loss.   It is the ''suing out'' of a writ of execution which extends the validity of a judgment.   (*Saville v. Schroyer*, 65 Kan. 303, 68 Pac. 1130.)   In the case cited the execution was never returned.

The case of *The State v. McArthur*, 5 Kan. 280, seems to be at variance with the views above expressed. There is a confusing suggestion, however, at the close of that opinion, in which the court declines to discuss the question whether the lien of the mortgage continues to exist after dormancy of the judgment.   To ·clear the path of obstacles which might embarrass or mislead litigants in the proper interpretation of those sections of the statute on which·we have commented, the case of *The State v. McArthur* is overruled.

The ruling of the court below will be reversed, with directions to overrule the motion to revive the judgment.

CUNNINGHAM, GREENE, POLLOCK, JJ., concurring.

BURCH, J. (dissenting) : I am unable to agree with the majority of the court in the decision of this case.

Section 4895 of the General Statutes of 1901 reads as follows :

"If execution shall not be sued out within five years from the date of any judgment that now is or may hereafter be rendered in any court of record in this state, or if five years shall have intervened between the date of the last execution issued on such judgment and the time of suing out another writ of execution thereon, such judgment shall become dormant, and shall cease to operate as a lien on the estate of the judgment debtor."

By the opinion of the majority this section is in effect made to read as follows : "If execution against the property of the judgment debtor of the kind commonly called "general execution" shall not be sued out within five years from the date of any judgment that now is or may hereafter be rendered in any court of record in this state, or if five years shall have intervened between the date of the last general execution issued on such judgment and the time of suing out another writ of general execution thereon, such judgment shall become dormant, and shall cease to operate as a lien on the estate of the judgment debtor." Presumably the strongest reason to be found for this emendation of the statute is given first, viz., that the section under consideration falls under a certain heading, by which the compilers of the code marked divisions of their work. This is one of the weakest tests known to the law for ascertaining legislative intention.

"It would seem to follow, that the fact that a particular provision is placed in a group prefaced by a particular heading, should not give the latter any very great weight in either extending or restricting the plain language of the provision, nor prevent a construction of it in connection with, and in the light of other provisions in other parts of the statute, classed under different headings, where, in the absence of such a division and classification, a comparison of all such provisions would be proper. It may be regarded as the sound view, that the grouping of provisions in an extended statute, a code, or a revision of laws, is, in general, designed for 'convenience of reference, not extended to control the interpretation.' Or, at most, it may be regarded as indicating the opinion of the draftsman, the legislators, or codifiers, as to the proper classification of the various branches of the enactment; which may or may not be accurate. The mere classifications can scarcely be deemed a part of the law. 'The only satisfactory and safe rule of construction to be adopted, is to read and construe together all sections of the code relating to the same subject-matter, without reference to the particular article or heading under which they may be placed.'" (Endlich, Interp. Stat. § 70.)

In *Griffith v. Carter*, 8 Kan. 565, and *Long v. Culp*, 14 id. 412, it was decided that separate subjects or articles having appropriate headings would be presumed to express the general rules upon the matters there treated, as against other sections only incidentally referring to such matters and occupied chiefly with other things. But this is merely a rule of subordination of parts in case of conflict, and has no application if there be neither doubt nor ambiguity. The same is true of the compilers' guides, which fulfil the same office as the label on the back of the book, but which have led a majority of my worthy associates astray.

"Headings prefixed to the titles, chapters and sec-

tions of a statute or code may be consulted in aid of the interpretation, in case of doubt or ambiguity; but inferences drawn from such headings are entitled to very little weight, and they can never control the plain terms of the enacting clauses." (Black, Interp. Laws, 181.)

In this case the words of the section are simplicity itself—plain, unambiguous, unmistakable. "If execution be not sued out," the judgment becomes dormant; that is, if some kind of process issued by the clerk and directed to the sheriff, which the law classifies under the term "execution," be not sued out, the judgment becomes dormant. Under code-section 442 this process may be any one of four kinds; and because the legislature does not pretend to limit the general and comprehensive word "execution" to any single, particular kind of execution out of four which it embraces, any one of the four must of necessity satisfy the requirements of the law. But if the label "Executions against the Property of the Judgment Debtor" must be read into the law because it is pinned to the section in review, an order of sale fulfils that requirement absolutely. It is an execution against the property of the judgment debtor. In the label, the plural, "executions," is used, but by the majority opinion it is cut down in its application to code-section 445 to one particular kind of execution.

"The true way for courts to ascertain the legislative intention is to observe and be guided by the language of the statute, and if this be clear and free from ambiguity, there is nothing left for interpretation; for when the act is conceived in clear and precise terms, when the sense is manifest, and leads to nothing absurd, there can be no reason to refuse the sense which it naturally presents. To go elsewhere to obtain something to enlarge its meaning is to endeavor to elude it." (*Fitzpatrick v. Gebhart*, 7 Kan. 35, 47.)

For the same reason a restriction of the plain meaning of plain words is an evasion of the law.

When it is said that section 445 is followed immediately by a section relating to general executions, the reply is obvious that it is also followed regularly and in order by the sections relating to the other three kinds of execution. All the sections up to 517 could not be numbered 446, and the mere fact that section 446 embraces one of a series of subjects treated in succession gives no warrant for saying that section 445, general in terms, and, so far as language is concerned, related to all the subjects following it, shall be construed only with a single one, or with a group next to it. And, as if for the very purpose of distinguishing itself from section 445, which commences simply, "If execution shall not be sued out," section 446 begins with the following differentiating phrase : "The writ of execution against the property of the judgment debtor."

It is said that *Norton v. Reardon*, 67 Kan. 302, 72 Pac. 861, decided that the direction to the sheriff found in section 4915, General Statutes of 1901, that he shall return a writ of execution within sixty days from its date, has no application to executions in specific cases like the one under consideration. This is true, and the decision is correct for the very simple and adequate reason given just at the close of that opinion. Since, by the statute requiring the execution to conform to the order of the court, the court could make the execution returnable in what time it pleased, a confirmation of the sheriff's sale was merely "an approval of that which as to the time of performance the court had power to order in the first instance."

As a sort of reduction to absurdity, a scornful "pushing of the argument home," it is said that if a

judgment may be kept alive by an order of sale it may also be kept alive by an execution against the person. Why not in any case where a seizure of the person is an execution of the judgment?

The sole end and aim of an execution is to enforce the judgment of the court. Whatever the judgment may be, execution has no office but to carry it into effect. The only purpose of dormancy is to cut off belated efforts to enforce a judgment. If the judgment is enforceable by seizure of the person, an execution against the person does carry it into effect, and answers every demand for diligence the law requires. Such a writ is the highest kind of execution known to the law, inasmuch as it deprives a man of his liberty until he makes satisfaction of the judgment awarded. Indeed, at common law, when a man was once taken on that writ, no other execution could issue either against his lands or goods. Certainly wherever the common law remains in force dormancy could not follow for the lack of a general execution. Under our statute such an execution may issue because a man has disposed of his property to prevent its seizure upon general execution. If, in such a case, the writ should issue shortly before the dormancy of the judgment, and the fraudulent debtor should be imprisoned under it, it would seem to be the quintessence of nonsense to require a worthless general execution to issue and be returned in order to support the vitality of that judgment. Until some reason is offered why the legislature should prefer and direct the doing of a vain, idle and impotent thing to one that is effective, I cannot think it does so, and must believe that an execution against the person of a judgment debtor who has fraudulently disposed of his property, so that a general execution would be futile,

is sufficient to prevent the judgment from becoming dormant.

Besides this, to prevent dormancy an execution need not reach anything whatever; neither property generally nor specifically, nor the person of the judgment debtor. All that is necessary is that it issue. (*Saville v. Schroyer*, 65 Kan. 303, 68 Pac. 1130.) That is, all the judgment creditor need do to keep his judgment alive is to assert its vitality by having process merely issued for its enforcement. Why, then, will not any kind of execution the judgment warrants be sufficient? Why will not an execution which would enforce the judgment, if it were served, answer the purpose, and why should the legislature take pains to say that a writ directed to an end utterly unattainable is better for the purpose of keeping the judgment alive, though not served, than one of some potency which is served?

The argument attempted to be made from the casual use and omission of the word "writ" here and there in the statute scarcely deserves notice. There is nothing magical in the word "writ."

"A writ process is an instrument in writing, in an epistolary form, running in the name of the sovereign of a state, issued out of a court of justice or by a judge thereof at the commencement of an action or at any time during its progress, or incident thereto, usually under the seal of the court, duly attested, and directed to some ministerial officer or to the party to be bound by it, commanding the commission of some act at or within a time specified, or prohibiting the doing of some act.

"The cardinal requisites are that the instrument issue from a court of justice or a judge thereof; that it run in the name of the sovereign of the state; that it be duly attested, but not necessarily by the judge, though usually but not always under seal; and that it be directed to some one commanding or prohibiting

the commission of an act." (Alderson, Jud. Writs and Proc. § 4, and note 1, p. 11.)

In the case under consideration the orders of sale issued from the same court, ran in the name of the same state, were signed by the same clerk, attested by the same seal, recited the same judgment, and were directed to the same sheriff, as a general execution would have been. The only difference possible between them would be that the orders of sale directed the sale of specific property to satisfy the judgment, while a general execution would have required it to be made first from personal property, and then from real estate. Just what it is that distinguishes these two kinds of process, and makes it a misnomer to call one of them a writ, I leave to a critical profession to discover.

The majority of my brethren, however, attempt to support their opinion by decisions from Ohio and Nebraska. I do not believe the cases cited to be authoritative.

A note to the Revised Statutes of Ohio of 1860 states that the code of that state was passed March 11, 1853, and took effect June 1, 1853. Prior to that time distinctions between actions at law and suits in equity prevailed there, and decrees in equity bore all the qualities accorded them by chancery practice. By the code such distinctions were abolished. The statement of facts shows that the proceedings furnishing the foundation for the controversy in *Beaumont et al. v. Herrick*, 24 Ohio St. 445, were old equity proceedings commenced by bill in chancery in 1852, in the court of common pleas. The cause continued to the end as a chancery suit, and during its progress a supplemental bill was filed as late as 1857. Several chancery decrees were rendered in the cause, the last one in

1857.   The cause was appealed to the district court, and then to the supreme court.   Several orders of sale were issued, and final confirmation of sale had in 1863. In 1870 the original petition in *Beaumont et al. v. Herrick* was filed, and the decision of the supreme court in that case was made in December, 1873.   The opening paragraph of the opinion is as follows :

"The decree rendered on the supplemental bill, which was appealed from by certain of the creditors, did not affect the decree rendered in favor of McBride, Sheldon . & Co. and Springer & Whiteman, setting aside the fraudulent conveyance and ordering the property to be sold.   The object of the supplemental bill was to marshal the liens of the respective parties with a view to the distribution after the sale of the property under the other decrees.   The last-named decrees remained in full force, and their execution, therefore, was not affected by the appeal."

The closing sentence of the quotation made by the majority of the court from the opinion in the Ohio case is as follows :

"The succeeding section prescribes what a writ of execution shall contain, and shows that it is wholly inapplicable to the enforcement of decrees in equity for the sale of specific property."

Section 602 of the Ohio code provided as follows :

"The provisions of this code do not apply to proceedings in actions or suits pending when it takes effect.   They shall be conducted to final judgment or decree, in all respects, as if it had not been adopted."

At the same time the statutes of Ohio made no provision whatever for the enforcement of decrees in equity.   Executions were of three kinds only — that is, against the property of the judgment debtor, against his person, and for the delivery of possession of real property.   (Civil code, § 419, Rev. Stat. 1860.)

No execution to conform to the code judgment had been provided.

From this it is perfectly apparent the court did nothing more than leave to old equity decrees all the qualities they possessed under the former chancery practice, and to hold the new code, which was barren of any sort of an execution for their enforcement, to be inapplicable to them.   Such a case can have no bearing whatever upon the questions involved in this case arising wholly under the provisions of our code, which does provide such an execution.          °

In *Moore v. Ogden*, 35 Ohio St. 430, the first sentence of the syllabus charcterizes the decision as inapplicable to a judgment under the code, and hence of no authority upon the question in review.   The syllabus reads :

''A decree of foreclosure of a mortgage was réndered before the code took effect.   It found the amount due on the notes of defendant, and ordered a sale of the mortgaged premises.   *Held*, that this was not a judgment, within the meaning of section 422 of the code, and that it did not become dormant by a failure to issue an order of sale within five years.''

Of course, a judgment to which the doctrine of executions had no application could not be such a judgment as would become dormant for failure to issue execution.

The case of *Herbage v. Ferree*, 65 Neb. 451, 91 N. W. 408, is a commissioner's opinion.   No pretense is made of any independent thought or judgment upon the proposition decided.   Without stating the facts of the controversy, it states the legal question involved, refers to the two Ohio decisions discussed above, and concludes as follows :

''Following these decisions, we recommend that the judgment of the district court be affirmed.''

In the statement of the question, however, the following significant language is used :

"The appellants insist that a decree of foreclosure becomes dormant if no steps are taken to enforce it for five years after its rendition, and that in this respect it is like a judgment at law."

In 1870 the legislature of this state passed a statute relating specifically to the final determination of the rights of parties to an action to foreclose a mortgage. (Code, § 399; Gen. Stat. 1901, §4848.) It does not use the word "decree," provides for nothing whatever except a judgment, and contemplates the judgment shall be enforced by process, duly issued, and executed by the sheriff. The language of the Nebraska decision, conceding the case to have been sufficiently considered to be an authority, can scarcely be reconciled with this law.

Our ancient ancestors roamed about in the jungles of law and equity and actions and suits. Our nearer legal progenitors led the lawyers up into the sunshine and pure air of the plains of the codes. Through some atavic impulse, a majority of my most respected associates make a sally toward the old racial habitat. On the way they meet the case of *The State v. McArthur*, 5 Kan. 280, thirty-three years old, and vigorous in every aspect, and through a surging up of old predatory instincts they slay it. Without qualification or limitation, they say the case is unconditionally overruled. The syllabus of the case contains two paragraphs, the first of which is as follows :

"The final determination of an action, whether it be by proceedings formally known as equitable or at common law, is by our code a judgment."

One paragraph of the opinion elaborated this doctrine as follows :

"Section 395 of the civil code, corresponding with

section 380 of the code in the compiled laws, defines 'a judgment as the final determination of the rights of the parties in an action.' Whatever was the definition of a judgment at common law, and whatever distinctions existed between a judgment and a decree under the old systems of practice, the section above quoted is decisive as to what is a judgment, under the code, and it makes no difference whether it is what would formally be called a judgment, an order, or a decree. The action of the court in the case of the relator, in 1860, was a final determination of the rights of the parties, and consequently was a judgment.''

This goes to the very foundation of our code practice, but it is overruled. Of necessity, the statute upon which it is expressly based impliedly falls, and section 10 of the code (Gen. Stat. 1901, § 4438), abolishing the distinction between actions at law and suits in equity, and the forms of all such actions and suits, is impliedly repealed. They cannot stand unless the portions of *The State v. McArthur* referred to are true, and that case is entirely overruled.

The opinion of the majority says there is a confusing suggestion at the close of the opinion in *The State v. McArthur*. What of it? That suggestion was upon a matter excluded by express words from the decision. There is no confusion relating to the matter which was decided. Of course, it was absolutely essential that the first paragraph of the syllabus, and the corresponding portions of the opinion, in *The State v. McArthur*, should be overruled in order to hold contrary to the second proposition there announced. If the first proposition stood, the second logically followed. But the only reason for overruling the decision at all was that it stood as a barrier to the importation of the Ohio law.

I prefer to dwell with Kingman and Valentine and Safford. I prefer to follow the legislature, and to

Watson v. Iron-works Co.

abide by the code.   I prefer to say that the final determination of the rights of the parties in a foreclosure action is simply a judgment, and to believe that if no process for its enforcement be issued within five years it becomes dormant.   I believe with the supreme court of Nebraska that ''whether the writ which the officer holds be called an execution, or an order of sale, it is but a written command, under the seal of the court, authorizing and directing him to execute its judgment.''   (*Burkett v. Clark*, 46 Neb. 466, 472, 64 N. W. 1113, 1115.)   I believe the doctrine announced by the court of appeals of the District of Columbia, in construing a statute using the general term ''execution,'' that ''the term 'execution,' as employed in the statute, is not to be construed in the restricted sense of process simply to collect the amount due on the judgment by levy and sale.   It embraces all the appropriate means to execution of the judgment.''   (*Green v. Mann*, 19 App. Cases, D. C., 243, 248.)   I believe that the issuance of any process which is for the enforcement of the judgment prevents dormancy ; and until some reason is offered why the legislature should command that a particular kind of writ is necessary for that purpose, I shall not believe it has so commanded, in the face of plain English words to the contrary.

I am authorized to say that Chief Justice JOHNSTON and Mr. Justice MASON join me in this dissent.

---

### OPINION ON REHEARING.
(78 Pac. 156.)
#### SYLLABUS BY THE COURT.

1. JUDGMENTS — *Dormancy—Special Executions*.   A decree was entered foreclosing a mortgage executed by A. to plaintiff, and also foreclosing several liens for material furnished to A. by parties who were brought in as defendants in the suit.   In the decree, K., one of the defendants, was given a judgment against

A., its codefendant, as principal, and W., another codefendant, as surety, for a certain sum of money due from A. The decree marshaled the liens and ordered the real estate charged to be sold. Six special executions were sued out by the plaintiff and the property was finally sold, leaving a deficiency due to K. on its judgment against A., as principal, and W., as surety. In none of these executions or orders of sale was there any mention of the money judgment in favor of K. and against W. More than five years after the entry of the decree a general execution was issued at the instance of K. against A., as principal, and W., as surety. *Held*, that the issuance of the special executions did not have the effect of preventing the judgment in favor of K. and against W. from becoming dormant.

2. ———— *Statute Construed.* A decree rendered in a suit to foreclose a mortgage or other lien is a judgment, within the meaning of section 4895, General Statutes of 1901, and an order of sale or special execution sued out by the plaintiff in the decree to enforce the same will have the effect of preventing a money judgment in favor of one defendant against his codefendant from becoming dormant, if the fact of such judgment and the amount thereof is recited or referred to in the order of sale. The case of *The State v. McArthur*, 5 Kan. 280, followed.

The opinion of the court was delivered by

SMITH, J. : In January, 1890, the Attica State Bank commenced suit against the Attica Sugar Company to recover the amount of certain bonds, and to foreclose a mortgage given to secure their payment. The Keystone Iron-works Company was made a party defendant, together with other parties having liens on the property. On June 10, 1891, a final decree was entered foreclosing and marshaling the liens. It was adjudged that the Attica Sugar Company was indebted to the Keystone Iron-works Company in the sum of $13,032.60, and that George W. Watson, plaintiff in error, and other persons, were sureties on said indebtedness in the sum of $11,774.90.

The judgment against the Attica Sugar Company, as principal, and the sureties mentioned, included a decree of foreclosure of a material-man's lien filed by

the Keystone company against the property of the sugar company, and the decree fixed this lien, in common with others, on one tract of real estate, and adjudged it to be a second lien, subject to that of the Attica State Bank, on another tract.

Six orders of sale were issued at the instance of the bank. These orders of sale followed the language of the decree, setting forth the amount due each of the lien-holders, of whom there were more than twenty. The orders of sale recited the several judgments against the Attica Sugar Company in favor of the different lien-holders. With respect to the Keystone Iron-works Company, each of the orders of sale contained the following:

"Whereas, the Keystone Iron-works Company obtained judgment in said court, on the 10th day of June, 1891, against the Attica Sugar Company and the Kansas State Sugar Company for the sum of $13,032.60, of which sum $11,774.90 draws interest at the rate of ten per cent. per annum, the balance at six per cent. per annum, and for the sum of $935.42 as costs of suit, in which said suit the Attica State Bank, of Attica, Kan., a corporation, was plaintiff, and the Attica Sugar Company, a corporation, the Kansas State Sugar Company, a corporation, George W. Watson and others [naming them] were defendants."

There was no reference or mention in any of these special executions or orders of sale of any judgment against Watson in favor of the Keystone Iron-works Company. The recitals were that the Keystone Iron-works Company obtained a judgment against the two sugar companies in a suit wherein the Attica State Bank was plaintiff and the two sugar companies and Watson and others were defendants. Each one of the orders of sale concluded as follows:

"These are, therefore, to command you to cause

the said above-described property to be appraised, advertised and sold according to law, separately, as described, and from the proceeds of such sale pay, first, the costs and expenses of suit and sale ; second, the judgment and the interest ; the residue, if any, to be paid into court to abide the order of said court.''

Four of the orders issued to carry out the decree were returned without sale—three in 1891 and one in 1893. On March 29, 1894, under a pluries order, the real estate was sold ; and under another, issued in January, 1895, certain pumps and fixtures were sold. On June 20, 1896, five years and ten days after the rendition of judgment, an execution was issued at the request of the Keystone Iron-works Company. This writ ordered that the sheriff, of the goods and chattels of the Attica Sugar Company and the Kansas State Sugar Company, as principals, and George W. Watson and others, as sureties, cause to be made the amount of $11,774.90, and $2485.90 interest on same, being the amount remaining due, and, for want of goods and chattels, that the amount be made out of the lands and tenements of the debtors. The writ is prefaced by the following recital :

''Whereas, the defendant and cross-petitioner, the Keystone Iron-works Company, on the 10th day of June, 1891, obtained judgment before the twenty-fourth judicial district court of the state of Kansas, within and for Harper county, against the Attica Sugar Company and the Kansas State Sugar Company, as principals, and George W. Watson, E. W. Deming, H. R. Kent, J. H. Dennis, and M. C. Clark, as sureties, for the sum of eleven thousand seven hundred and seventy-four and $\frac{90}{100}$ ($11,774.90) dollars debt, with interest at the rate of ten per cent. per annum.''

This execution was returned ''No property found,'' on July 22, 1896.

This proceeding was begun on May 3, 1902, by the Keystone Iron-works Company, in the district court, to revive its judgment against Watson and his co-sureties. It relied on the above-mentioned orders of sale, issued at the instance of the Attica State Bank, to preserve the vitality of its judgment against Watson and others.

The question presented is whether such orders of sale had the effect to keep the judgment of the Keystone Iron-works Company against Watson alive. If they did not, then the judgment was dormant when the execution of June 20, 1896, was sued out.

The orders of sale were executed by exhausting the property on which the several liens were fixed by the court in the foreclosure decree. There was no direction in any of them that a deficiency be collected from Watson or his cosureties. The latter did not own any of the property, real or personal, involved in the decree of forecloseure. The orders of sale were directed solely against the property of the Attica Sugar Company. The judgment and decree against the sugar company in favor of the Attica State Bank was in one amount, $13,032.60, together with a foreclosure of a lien, and the judgment against Watson and the other individuals, in favor of the Keystone Iron-works Company, was for $11,774.90, without any foreclosure.

There were twenty other judgments, in favor of various lien-holders, against the Attica Sugar Company, none of them against Watson. Let us suppose that the Fulton Iron-works Company, which was decreed to have a lien for over $6000 on the property of the sugar company, with no judgment against Watson, had caused the several orders of sale to issue; can it be said that such proceeding would in legal effect amount to an execution against Watson?

5—70 KAN.

There was no attempt by any of the judgment creditors to collect any amount from Watson by execution until after the judgment had become dormant.

Whether the orders of sale had the effect to keep alive the judgment of the Keystone company against Watson must be determined in view of the reason for the statutory rule rendering a judgment dormant where it has stood for five years without an execution's issuing. The rule is that a certain degree of diligence is required to be exercised by plaintiff, as evidence that the judgment remains in force and has not been released or abandoned. If five years intervene between executions, "the law presumes the judgment satisfied, and will not permit the judgment debtor to be disturbed by execution, until the judgment is revived." ( *The State v. McArthur*, 5 Kan. 280.) "The principle upon which the issue of an execution keeps alive a judgment is that thereby the plaintiff affirms its vitality. . . .'" ( *Halsey v. Van Vliet*, 27 Kan. 474, 481.) Two tests suggested in *Kelley et al. v. Vincent*, 8 Ohio St. 415, for determining whether an act of the plaintiff is sufficient to continue the judgment in effect are whether it "affords a reasonable public claim, on the part of the plaintiff, that the judgment remains in full force," and whether by it any evidence is "afforded to those interested in ascertaining the continuance of the judgment lien." Another test suggested in *Halsey v. Van Vliet, supra*, is whether it is "an assertion by the plaintiff that the judgment is unpaid, and that he is intending at some time and in some way to enforce its collection." ( Pages 481, 482.)

In the present case the orders of sale do not recite the judgment of the Keystone company against Watson, nor refer to it in any way. This omission cannot be regarded as a mere inadvertence, for it occurs in each of the six writs issued between June 10, 1891,

and June 20, 1896. Nor is it cured by any general recital or reference to the judgment, for no such recital or reference is employed. Each writ sets out in full detail every portion of the judgment, including plaintiff's judgment against Watson, as surety, and each separate judgment, excepting only that of the Keystone company against Watson and his fellow sureties. In this there was no affirmance by the Keystone company that its judgment against Watson remained unsatisfied and that it intended some time to enforce it. Not one of the orders of sale afforded a reasonable public claim on the part of the iron-works company that its judgment against Watson remained in full force. The inference from the studied omission is that it had released them, as it had a right to do, or that it had abandoned its claim as to him and did not intend to seek its enforcement. The reading of the orders of sale would not have advised any one interested in ascertaining whether these were judgment liens against Watson of any judgment against him, except that of plaintiff. From the time judgment was rendered until the issuance of the general execution, nothing was done that might not with equal propriety have been done in the same manner if Watson had been previously discharged from liability to the Keystone company. No step was taken that was in any degree inconsistent with the theory that he had been released from all obligations to that company. In fact, the persistent recital in the orders of sale that plaintiff's judgment ran against Watson, as well as against the sugar companies, and the no less persistent omission of any reference to a judgment of the Keystone company against him, might, as already suggested, have afforded a reasonable ground for an inference that for some reason the latter judgment was no longer in force. Therefore, the doctrine that

an order of sale is an execution, and that its issuance will keep alive the judgment upon which it is sued out, has no application here and cannot justify a finding that the validity of the Keystone company's judgment against Watson was preserved by the orders of sale issued in this case. It was within the power of the Keystone Iron-works Company, by merely issuing an execution against Watson and the other judgment debtors, to have prevented the dormancy of its judgment. No levy was necessary for the purpose. (*Saville v. Schroyer*, 65 Kan. 303, 68 Pac. 1130.)

After a reargument of the case, the court is of the opinion that the issuance of an order of sale or special execution to carry into effect a decree directing the sale of real estate has the effect to keep the judgment alive, and that such orders of sale are executions within the meaning of section 4895, General Statutes of 1901. The decision in *The State v. McArthur*, 5 Kan. 280, is followed. This holding would affirm the ruling of the court below sustaining the motion to revive, if the several orders of sale had made reference to the judgment of the Keystone Iron-works Company against Watson.

The ruling of the court below will be reversed, with directions to overrule the motion to revive the judgment.

MASON, J., concurring.

SMITH, J. (concurring specially): Although concurring in the judgment of reversal, I disagree with the majority of the court on the position they have taken (indicated in the second paragraph of the syllabus), holding that a special execution, which must follow the order of the court, is comprehended within the language of section 4895, General Statutes of 1901, and that the issuing of an order of sale has the effect

of preventing dormancy.   My views on this question are given in the opinion in this case handed down after its first submission.   (*Ante*, page 43.)   Nothing on the reargument has shaken my belief in the soundness of the view of the majority expressed when the case was first decided.

Justices CUNNINGHAM and GREENE concur with me.

BURCH, J. (dissenting) :   The executions relied upon by the Keystone Iron-works Company to prevent dormancy conformed to the judgment and order of the court, and were valid writs.   They were sufficient in every matter of form and of substance to constitute process lawfully enforceable, and they actually performed that office to the extent of appropriating property.   This being true, the mere fact that the clerk did not embody in the execution other recitals not essential to their validity as writs could not impair their efficacy to prevent dormancy.   Unimpeachable executions having issued, the judgment continued in force for the full statutory period.

The opinion of the majority continually refers to the "judgment against Watson" as if it were a separate and distinct thing, entirely disassociated from every other result of the litigation.   The theory seems to be that, because the executions which were issued did not recite the fact that by the determination of the court Watson was obliged to pay, no execution was issued on the "judgment against Watson," and, hence, that the "judgment against Watson" became dormant.   The judgment against Watson, however, was the same judgment as that against the sugar company.   The sugar company was principal and Watson was surety, and the judgment was as single as the debt.   The fact that separate sentences, or clauses, or paragraphs, were employed to express the

determination of the court, and the fact that special reference was made to the property of the principal debtor, did not make the judgment multifarious. It remained a unity. The language fixing the liability of Watson merely expressed that part of the conclusion of the court which related to him, but it did not form an isolated, independent judgment, separate and distinct from another judgment against the sugar company. When, therefore, the executions which were issued recited that, in an action described, the Keystone Iron-works Company obtained a judgment against the sugar company, they necessarily recited a judgment against Watson, and the issuing of such executions did affirm the validity of that judgment, did constitute a public claim that it remained in full force and unpaid, and did assert an intention to enforce its collection.

In the case of special executions the statute requires no more than that they shall conform to the judgment. If they do this, nobody interested in ascertaining the continuance of the judgment as a lien has any right to infer that any one obligated to pay has been released because additional recitals foreign to the immediate purpose of the writs are not incorporated. If a judgment run against a principal and surety, as in this case, the property of the principal must be exhausted before that of the surety can be assailed. If the judgment creditor undertakes to do this by valid executions appropriate to the purpose, there is no warrant whatever for inferring that sureties are released because the provisions of the judgment respecting them are not injected into the writs. Nor does it make any difference who causes execution to issue for the enforcement of a judgment, if it rightfully issue. The clerk of the court can keep a judgment alive by issuing executions for unpaid costs, on his own account.

A rule which allows the accidental clerical omission from· an execution of a single name in a long list of judgment debtors to induce dormancy as to that person, while the judgment remains alive and enforceable against all others, simply sublimates technicality and adds a court-made complication to what should be a plain, simple process for obtaining the fruits of a judgment.

For these reasons I dissent from the first paragraph of the syllabus and the corresponding portions of the opinion.

Chief Justice JOHNSTON and Mr. Justice ATKINSON join me in this dissent.